# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Jami Montgomery, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| DePaul University, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

The Plaintiff brings this case against the Defendant under Title VII of the Civil Rights Act of 1964, under Section 42 U.S.C. 1981, and under the common law of the State of Illinois. He alleges that the Defendant discriminated against him because of his race when it denied his application for promotion and tenure and that Defendant retaliated against him because he opposed discrimination and supported diversity in Defendant's hiring, retention, and tenure decisions. He also alleges that Defendant violated the employment contract created by the provisions of the Faculty Handbook of the University. Specifically, Plaintiff complains against Defendant as follows:

1.     The Plaintiff in this case is Dr. Jami Montgomery. Dr. Montgomery lives at 5238 South Michigan Avenue in Chicago, Illinois. He is African-American. In 2000, Dr. Montgomery received a doctorate in Computer Science from the Illinois Institute of Technology. Previously, he received a Bachelor of Science in Electrical Engineering from Prairie View A. & M. University in 1985 and a Master of Science in Computer Science from DePaul University in June 1989.

2.     Defendant DePaul University ("DePaul") is located in Chicago, Illinois. It is a private, Catholic institution of higher education. DePaul has approximately 24,000 students and

more than 5,000 employees. DePaul is an employer engaged in commerce as defined by 42 U.S.C. Section 2000e, Paras. (b), (g) and (h).

3.    In 2002, Dr. Montgomery applied for and received a "tenure track" position in the School of Computer Science, Telecommunications and Information Systems ("CTI") at DePaul University.

4.    A "tenure track" position at DePaul is a faculty position that may lead to the award of tenure after service of a probationary period.

5.    Tenure track positions at DePaul are filled using a formal faculty search process. This process includes national advertising and an effort to create a pool of applicants. The applicants formally interview with faculty members of the University prior to their appointment.

6.    One of prime purposes of this formal search process is to enhance the quality and diversity of the tenure track appointments in the University.

7.    When Dr. Montgomery joined CTI in the Fall of 2002, it had approximately 55 faculty members who were either tenured or on the tenure track. CTI had no tenured African-American faculty members in the Fall of 2002. In fact, CTI has never had a tenured African-American faculty member.

8.    Since 2002, only one other African-American, Joseph Phillips, was appointed into a tenure track position at CTI. Phillips did not receive tenure.

9.    CTI employs many faculty members who have "full-time" appointments. A "full-time" appointment requires a faculty member to teach a full course-load of classes, but service in such an appointment does not lead to tenure.

10.     Hiring decisions for "full-time" appointments in CTI are made by the Dean of CTI. Such hiring decisions are made without the input of a formal faculty search committee and without a national search.

11.     The Dean of CTI has converted many full-time appointments to tenure-track appointments. The appointments held by GianMario Besana, Jacek Brzezinski, Kamal Dahbur, Lucia Dettori, Alan Jeffery, Eric Sedgwick, Amber Settle, Adam Steele, Theresa Steinbach, and Noriko Tomuro, among others, were converted from full-time to tenure track appointments. Besana, Dettori, Jeffery, Sedgwick, Settle, Steele, Steinbach, and Tomuro subsequently were granted tenure. All of these individuals are white, with the exception of Noriko Tumuro, who is Asian.

12.     The Dean of CTI has converted other full-time appointments into tenure track appointments for faculty members who hold positions in the cinema program. These include the positions held by Ronald Eltanal, Scott Erlinder, Matt Irvine, Joseph Linhoff, and Gary Novak. All of these individuals are white.

13.     In the Fall of 2002, there were three African-Americans in CTI holding full-time appointments, Charles Sykes, Joseph Morgan, and Roymieco Carter. None of their appointments were converted into tenure track appointments. None achieved tenure.

14.     As of June 2009, CTI has not hired an African-American faculty member into either a tenure track or full-time position since it hired Dr. Montgomery and Dr. Phillips in 2002.

15.     In the Fall of 2007, Montgomery applied for promotion and tenure at DePaul University. His application for promotion and tenure was approved by the tenured faculty in CTI by a vote of 26 to 7 and by the Dean of CTI, Dr. David Miller. In June 2008, his application for promotion and tenure was rejected by the Provost of the University, Dr. Helmut Epp, and by the President, Dennis H. Holtschneider.

16.     In 2008, the cinema program was formally merged with CTI, and CTI was renamed the College of Digital Media ("CDM").  CDM has two schools, the School of Computing ("SoC") and the School of Cinema and Interactive Media ("CIM").  The current website for CDM states that one out of three students in the College is a person of color.

17.     As of June 2009, CDM had no African-Americans who were either tenure track or full-time faculty members.

18.     During his employment at DePaul, Dr. Montgomery engaged in protected oppositional activity under the civil rights laws.  Specifically:

(a)     In 2007, he helped represent one of his African-American colleagues at CTI, Dr. Joseph Phillips, in an effort by Phillips to receive additional adjunct employment after his regular employment was terminated without adequate notice by the University.

(b)     In 2007, he also assisted Dr. Phillips in an attempt to determine whether Dr. Phillips could file a grievance under the Faculty Handbook or take other actions to continue his employment at the University.

(c)     In the 2005-2006 academic year, the Dean of CTI, Dr. Helmut Epp, applied for the position of Provost of the University.  During the application process, Dr. Epp participated in a public meeting of the faculty in connection with his application.  During this public meeting, Dr. Montgomery inquired about Dr. Epp's commitment to diversity, asking him, "what are the matrices and measures" that should be used to hold the University and its officials and subdivisions "accountable" for improving diversity.  Dr. Epp replied that holding administrators "accountable" is language that is "too strong" and that the University has "good intentions."  He also told Dr. Montgomery that his commitment is evidenced by the fact that he had brought Dr. Montgomery into CTI.  In response, Dr. Montgomery stated that there were not any tenured African-American

faculty in CTI and that there were only a small number of African-American faculty on the staff of the College. Dr. Montgomery also stated that he believed that greater accountability is necessary to increase the diversity of the faculty members at the school and to mirror the diverse make-up of the community served by CTI and of CTI's student body. After this exchange of statements, Dr. Epp turned red in the face, turned away from the issues raised by Dr. Montgomery, and called on other faculty members and answered their questions. Dr. Epp was appointed Provost.

(d) In 2006, Dr. Montgomery helped found and subsequently chaired the Diversity Committee for CTI. The purpose of this Committee was to assist the School in achieving the goals set forth in the President's "2012 Plan." Dr. Montgomery and the Committee actively sought a role in the process used to name a permanent Dean of the school after Dr. Epp became Provost and reported the results of their efforts to the faculty of CTI. Dr. Montgomery proposed that the faculty members involved in the recruitment process receive diversity training. He proposed this to the recruitment committee, and the chair of the committee declined to incorporate his proposal into the recruitment process. Later, at a public faculty meeting, Dr. Montgomery sought the approval of the full faculty of CTI for his proposal and was successful in obtaining some diversity training for the chairman of the recruitment committee.

(e) While serving as the Chair of the Diversity Committee in CTI, Dr. Montgomery also advocated on behalf of two faculty members whose teaching responsibilities were terminated during the middle of an academic semester. The wife of one of these faculty members had filed a gender discrimination charge against the University. When Dr. Montgomery asked about this issue during an open meeting of the Dean's Advisory Council, the Dean, Dr. David Miller, became annoyed and irritated with him.

-5-

(f)     In February 2006, Dr. Montgomery expressed his concerns about DePaul's inability to meet its goals with respect to diversity directly to the President of the University.

(g)     When Dr. Montgomery appeared before the University Board in support of his application for tenure, he told the members of the Board that he considered creation of the Diversity Committee in CTI and establishing a diversity component during the interview process for the candidates for Dean of CTI as among his greatest contributions to the University during his employment at the University.

(h)     During his tenure at DePaul, Dr. Montgomery had other conversations with both the Dean of CTI (Dr. David Miller) and the Provost of the University (Dr. Helmut Epp) about the need for greater diversity in the faculty of CTI.

19.     Dr. Montgomery applied for promotion and tenure in the fall of 2007.  The faculty of CTI voted 26 to 7 in favor of his application.  The Dean of CTI, Dr. Miller, also recommended him for promotion and tenure.  The University Board on Promotion and Tenure, chaired by the Provost, Dr. Epp, however, voted against the application for promotion and tenure.  Dr. Epp also recommended that the President of the University deny Dr. Montgomery promotion and tenure, and the President followed that recommendation.

20.     The breadth and quality of Dr. Montgomery's teaching activities in CTI were equivalent to other faculty members in CTI who have received promotion and tenure.

21.     The breadth and quality of Dr. Montgomery's service activities within CTI and the University were equivalent to other faculty members in CTI who received promotion and tenure.

22.     White males in CTI who received fewer votes for tenure from their colleagues in CTI and/or who had a smaller percentage of favorable votes for tenure than Dr. Montgomery have

received tenure from the University. In other words, white males received tenure even though there were "split votes" in CTI.

23.    White males and females at CTI who had equivalent or lesser research records than Dr. Montgomery have received tenure at the University.

24.    The University Board and the Provost, Dr. Epp, relied on subjective anonymous comments by the faculty of CTI to support their negative recommendation on Dr. Montgomery's application for promotion and tenure.

25.    Dr. Epp was aware of the votes and tenure decisions referred to in Paragraphs 22 and 23 because he was Dean of CTI during this period. He was also aware of the process used by CTI and that it included the review of anonymous comments by School faculty members in the tenure decision-making process.

26.    Dr. Epp discriminated on the basis of race when he recommended that Dr. Montgomery be denied promotion and tenure.

27.    The University Board discriminated on the basis of race when it recommended that Dr. Montgomery be denied promotion and tenure.

28.    Dr. Epp retaliated against Dr. Montgomery for his oppositional activity when he recommended that Dr. Montgomery be denied promotion and tenure.

29.    The President of the University, Rev. Dennis Holtschneider, C.M., relied on the recommendations of Dr. Epp and the University Board when he made the decision to deny Dr. Montgomery's application for promotion and tenure.

30.    The employment of faculty members at DePaul University is governed by a Faculty Handbook. The Handbook is the authoritative source of policy with respect to issues of faculty

employment. The Chapter of the Handbook that regulates the evaluation of faculty is attached hereto as Exhibit A.

31.     The Faculty Handbook is widely disseminated to all faculty at DePaul so that all faculty know the procedures for obtaining promotion and tenure and the criteria for doing so. Faculty members appointed at DePaul work pursuant to the policies and terms set forth in the Handbook.

32.     Dr. Montgomery agreed to work pursuant to the terms of the Faculty Handbook when he was appointed to the faculty in 2002 and continued to work pursuant to the terms of the Faculty Handbook throughout his employment at DePaul.

33.     The Faculty Handbook constitutes a binding employment contract between DePaul and its faculty employees, including Dr. Montgomery.

34.     The DePaul University Faculty Handbook has specific provisions that set forth the process for evaluating promotion and tenure applications at DePaul. With respect to the authority of the University Board, the handbook states the following:

> Decisions subsequent to that made at the initial level shall consider the method and care of application of the approved standards by the lower level units, including matters of stringency, consistency and fairness, in addition to any unusual implications the decision may have at the college/school or university level. Only in cases where lower level decisions are judged to be deficient in significant respects shall upper level units make their own application of the substantive criteria of the candidate's scholarly or artistic area.

35.     The University Board made no finding that the lower-level decisions made by the School and the Dean were deficient in significant respects with respect to Dr. Montgomery's application for promotion and tenure. The University Board therefore violated the Faculty

Handbook when it proceeded to independently apply the CTI criteria for promotion and tenure to determine whether Dr. Montgomery's application for promotion and tenure should be granted.

36.     The University Board's application of the CTI criteria for tenure in Dr. Montgomery's case was different than its application of criteria to other CTI and University applicants for tenure.

37.     The Faculty Handbook also states that "any reversal of the decision of a prior level shall be reported promptly to the departmental chair and/or academic dean of the prior level along with the reasons for the reversal." The Handbook also obligates the chair or the dean to inform the candidate for tenure of a decision in his or her case before it moves on to the next level.

38.     The University Board violated these provisions of the Handbook when it did not give the chair, the Dean, or Dr. Montgomery timely notice of its decision.

## COUNT I

This cause of action is based upon Section 703(a)(1) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e-2(a)(1). This court has jurisdiction over this Count based upon 42 U.S.C. Section 2000e-5(f)(3). Plaintiff re-alleges Paragraphs 1 to 38 and incorporates them by reference as Paragraphs 1 to 38 of this Count.

39.     Dr. Montgomery's application for promotion and tenure met the standards for promotion and tenure established by CTI and the University.

40.     Defendant DePaul discriminated against Dr. Montgomery on the basis of race when it denied his application for promotion and tenure.

41.     Dr. Montgomery filed a timely charge with the United States Equal Opportunity Commission. This charge is attached as Exhibit B.

42.     On November 19, 2009, Dr. Montgomery received a "Notice of Right To Sue" from the EEOC. This Notice is attached as Exhibit C.

43.     Defendant DePaul's discrimination against Dr. Montgomery has caused Dr. Montgomery economic damages, pain and suffering, and emotional distress.

44.     Defendant DePaul's discrimination against Dr. Montgomery was intentional, and it justifies the award of punitive damages.

WHEREFORE, Plaintiff prays that the Court award the following relief:

(a)     render a decision finding that Defendant discriminated against Plaintiff;

(b)     award damages for Plaintiff's economic losses and emotional distress;

(c)     award Plaintiff reinstatement and/or front pay;

(d)     award Plaintiff punitive damages;

(e)     award Plaintiff the costs and reasonable attorney fees of prosecuting this cause of action; and

(f)     award any other relief that seems equitable and just.

## COUNT II

This cause of action is based upon Section 704(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e-3(a). This court has jurisdiction over this Count based upon 42 U.S.C. Section 2000e-5(f)(3). Plaintiff re-alleges Paragraphs 1 to 38 and incorporates them by reference as Paragraphs 1 to 38 of this Count.

39.     Dr. Montgomery's activities as set forth in Paragraph 18 constituted protected oppositional activities under Title VII of the Civil Rights Act of 1964, as amended.

40.     Defendant DePaul denied Dr. Montgomery's application for promotion and tenure to retaliate against him for his protected oppositional activities. This conduct violated Section 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e-3(a).

41.     Dr. Montgomery filed a timely charge with the United States Equal Opportunity Commission.  It is attached as Exhibit B.

42.     On November 19, 2009, Dr. Montgomery received a "Notice of Right To Sue" letter from the EEOC.  It is attached as Exhibit C.

43.     Defendant DePaul's retaliation against Dr. Montgomery has caused Dr. Montgomery economic damages, pain and suffering, and emotional distress.

44.     Defendant DePaul's retaliation against Dr. Montgomery was intentional, and it justifies the award of punitive damages.

WHEREFORE, Plaintiff prays that the Court award the following relief:

(a)     render a decision finding that the Defendant retaliated against Plaintiff;

(b)     award damages for Plaintiff's economic losses and emotional distress;

(c)     award Plaintiff reinstatement and/or front pay;

(d)     award Plaintiff punitive damages;

(e)     award Plaintiff the costs and reasonable attorney fees of prosecuting this cause of action; and

(f)     award any other relief that seems equitable and just.

## COUNT III

This cause of action is based upon 42 U.S.C. Section 1981.  This court has jurisdiction over this Count based upon 28 U.S.C. Section 1343 and 28 U.S.C. Section 1331.  Plaintiff re-alleges and incorporates by reference Paragraphs 1 to 38 of the Complaint above.

-11-

39.     Dr. Montgomery's application for promotion and tenure met the standards for promotion and tenure established by CTI and the University.

40.     Defendant DePaul discriminated against Dr. Montgomery on the basis of race when it denied his application for promotion and tenure.

41.     Defendant DePaul's discrimination against Dr. Montgomery has caused Dr. Montgomery economic damages, pain and suffering, and emotional distress.

42.     Defendant DePaul's discrimination against Dr. Montgomery was intentional, and it justifies the award of punitive damages.

WHEREFORE, Plaintiff requests that the Court award the following relief:

    (a)     render a decision finding that the Defendant discriminated against Plaintiff;

    (b)     award damages for Plaintiff's economic losses and emotional distress;

    (c)     award Plaintiff reinstatement and/or front pay;

    (d)     award Plaintiff punitive damages;

    (e)     award Plaintiff the costs and reasonable attorney fees of prosecuting this cause of action; and

    (f)     award any other relief that seems equitable and just.

## COUNT IV

This cause of action is based upon 42 U.S.C. Section 1981. This court has jurisdiction over this Count based upon 28 U.S.C. Section 1343 and 28 U.S.C. Section 1331. Plaintiff re-alleges and incorporates by reference Paragraphs 1 to 38 of the Complaint above.

39.     Dr. Montgomery's activities as set forth in Paragraph 18 constituted protected oppositional activities under Section 1981 of the Civil Rights Act of 1866, as amended.

-12-

40.    Defendant DePaul denied Dr. Montgomery's application for promotion and tenure to retaliate against him for his protected oppositional activities. This conduct violated Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. Section 1981.

41.    Defendant DePaul's retaliation against Dr. Montgomery has caused Dr. Montgomery economic damages, pain and suffering, and emotional distress.

42.    Defendant DePaul's retaliation against Dr. Montgomery was intentional, and it justifies the award of punitive damages.

WHEREFORE, Plaintiff requests that the Court award the following relief:

(a)    render a decision finding that the Defendant retaliated against Plaintiff;

(b)    award damages for Plaintiff's economic losses and emotional distress;

(c)    award Plaintiff reinstatement and/or front pay;

(d)    award Plaintiff punitive damages;

(e)    award Plaintiff the costs and reasonable attorney fees of prosecuting this cause of action; and

(f)    award any other relief that seems equitable and just.

## COUNT V

This cause of action is for a breach of contract under the law of the State of Illinois. This court has pendant jurisdiction over this case under 28 U.S.C. Section 1367. Plaintiff re-alleges and incorporates by reference Paragraphs 1 to 38 of the Complaint above.

39.    The process followed by DePaul University when it considered Dr. Montgomery for promotion and tenure breached the employment contract Dr. Montgomery had with the University by virtue of the Faculty Handbook.

-13-

40.    The breach of the employment contract set out in this case contributed to the University's denial of promotion and tenure.

41.    The breach of contract and the denial of promotion in this case have caused substantial economic losses to Dr. Montgomery and will continue to cause him additional economic losses in the future.

WHEREFORE, Plaintiff requests that the Court award the following relief:

(a)    declare that the DePaul University Faculty Handbook constitutes a binding employment contract between the University and the faculty members of the University;

(b)    declare that Defendant DePaul breached the provisions of that contract when it considered Plaintiff's application for promotion and tenure and that this breach of contract contributed to the decision to deny tenure to Plaintiff;

(c)    award damages to Plaintiff to compensate him for this breach of contract; and

(d)    award any other relief that it deems equitable and just.

## JURY DEMAND

Plaintiff hereby demands trial by jury.

Respectfully submitted,

CORNFIELD AND FELDMAN

Dated:  January 6, 2010                    By:    /s/ Stephen A. Yokich
                                                   Stephen A. Yokich
CORNFIELD AND FELDMAN
Suite 1400                                         Attorneys for Plaintiff
25 East Washington Street
Chicago, IL 60602-1803
(312) 236-7800
(312) 236-6686 (fax)

-14-

**Exhibit A**

**DEPAUL UNIVERSITY FACULTY HANDBOOK v. 2000-2001**
**EVALUATION OF FACULTY**

**SECTIONS INCLUDED**

General Meaning

Types of Review
    Annual Performance Review
    Tenure-track Probationary Review
    Promotion and Tenure Review

Evaluative Criteria

    Teaching
    Scholarship, Research and/or other Creative Activities
        Definition
        Guidelines and Criteria
    Service
        Definition
        Types of Service
        Statement of Expectations
        Documentation
        Criteria for Evaluation
    Distinctive and Significant Contributions

Promotion: Specific Criteria by Rank

    General Criteria
    Assistant Professor
    Associate Professor
    Professor

Tenure

    Contract Rights
    Eligibility
    Externally Supported Appointments
    Denial of Tenure
    Termination of Tenured Appointments

Procedures and Timetable for Promotion and Tenure

    Process
    Supporting Materials
    University Board on Faculty Promotion and Tenure
    University Promotion and Tenure Schedule

# EVALUATION OF FACULTY

## GENERAL MEANING

DePaul University fosters a continual evaluation process in all aspects of the university community. A major element in this process is the multi-faceted process of faculty review. The purpose of review is to encourage a dialogue between and among faculty and administrators in order to better meet the missions and goals of the university. It is a continual, on-going process that incorporates several types of review.

## TYPES OF REVIEW

### Annual Performance Review

All full time faculty – tenured, tenure-track, and non tenure-track – are reviewed annually through a process comprised of a review and evaluation of performance during the past academic year based on college-specific criteria and responsibilities. It may serve one or all of the following purposes:

1.    to provide an opportunity for feedback on performance during the past year, to communicate expectations, and to develop personal goals for the coming year;
2.    to determine salary recommendations; and
3.    in the instance of non tenure-track, one-year appointments, to determine whether contract renewal for the next academic year is appropriate and desired.

Reviews of performance are formal written processes that are implemented by the departmental chair and/or academic dean of the respective college or school. Although part of the annual review process, salary recommendations may be based on criteria and considerations somewhat different from those affecting promotion and tenure and/or contract renewal decisions. Salary decisions are made in accordance with university budget guidelines and usually are made at a different time during the academic calendar year. Normally, salary decisions result in a merit increase and —when budgets permit – may include increases for such

things as equity and market adjustments. The academic dean of the respective college or school makes the salary recommendation to the executive vice president for academic affairs.

### Tenure Track Probationary Review

Untenured, tenure track faculty will serve a probationary period before attaining eligibility for tenure. The duration of the probationary period will be determined within the initial faculty contract. During the probationary period, the untenured faculty member will be subject to an annual probationary review – distinguished from the annual performance review described above – to be conducted by the faculty member's home academic unit. The purpose of the probationary review shall be:

1.    to assess progress toward promotion and tenure by evaluating performance in the context of promotion and tenure standards and to provide guidance and establish priorities for satisfying established criteria; and,
2.    to determine whether re-appointment for the next academic year is appropriate and desired.

A formal evaluation by peers, selected by a procedure decided by the faculty in the unit, shall take place at least every second year. However, formal evaluations by the academic unit shall be made annually if early evaluations make re-appointment questionable.

In formal evaluations, a student representative shall participate in the deliberative process according to the policy of the academic unit. The student representative shall be selected from among the student group(s) most appropriate, given the academic discipline or area of the faculty member under consideration.

2

Each formal or informal evaluation shall result in a written recommendation to the dean for re-appointment or termination.

The dean shall decide the issue of re-appointment or termination and report his or her decision to the department or appropriate academic unit. If the dean and the department or appropriate academic unit are in disagreement, the department or academic unit may appeal the dean's decision to the executive vice president for academic affairs. In such cases, the department and academic dean shall report to the executive vice president for academic affairs the reasons for their respective positions. The executive vice president for academic affairs shall make the decision and shall report it to the faculty member.

## Promotion and Tenure Review

### General Criteria

DePaul University shall appoint, retain, promote, tenure and reward faculty who best help the university attain its goals and fulfill its mission, as these are articulated in this Faculty Handbook. The criteria for the decisions are the quality of the candidate's:

1. teaching and learning
2. scholarship, research, and/or other creative activities, and
3. service to the university

Service to the community and to the profession are also significant considerations but cannot stand in lieu of service to some elements of the university.

The determination that an individual meets these criteria is made primarily on the basis of guidelines promulgated by the candidate's department or – in the absence of departmental structures – by the college or school, which state what is to be expected of faculty with regard to the above areas.

These guidelines are to be informed by criteria specific to that unit's professional discipline, field or interdisciplinary area. The academic unit employs these guidelines only after they have been approved as being consistent with the general university criteria stated in this Faculty Handbook (following section). The University Board on Faculty Promotion and Tenure, consisting of representatives from the colleges or schools appointed by the Faculty Council, shall be responsible for making these determinations.

Decisions subsequent to that made at the initial level shall consider the method and care of application of the approved standards by the lower level unit(s), including matters of stringency, consistency, and fairness, in addition to any unusual implications the decision may have at the college/school or university level. Only in cases where lower level decisions are judged to be deficient in significant respects shall upper level units make their own application of the substantive criteria of the candidate's scholarly or artistic area.

University-level deliberations shall consider the desired range of:

- combinations of teaching and learning; scholarship, research, and/or other creative activities; and service,
- the variety of roles through which faculty members serve the institution,
- the differing needs of the individual units,
- the institutional demands made on faculty, and
- the varying levels of support available to faculty members in different units for these various activities.

Promotion and merit evaluations must recognize continuing efforts toward improvement and involvement in the three major activity areas according to the level of a faculty member's expertise and the resources available. Tenure evaluations must project the probable future performance of the faculty member in these areas as indicated by accomplishments and efforts during the probationary years. The initial and basic evaluation is carried out at the level of the lowest academic unit of the faculty member's appointment, where one's peers are assumed to represent the institution's best expertise in the relevant academic field.

A faculty member with a formal appointment in more than one academic unit or college/school shall be evaluated by the home unit and shall be evaluated independently by the second unit if it so chooses, or if requested to do so by either the candidate or by the home unit.

The academic unit of the formal appointment shall evaluate a faculty member who teaches in the academic unit of the formal appointment as well as in a program unit. Programs or other entities for which the faculty member teaches or carries out other formally assigned duties shall be invited to submit evaluations which are to be included with the home unit's evaluation and to be given weight at each stage of the review process in a way that approximates the portion of the workload assigned in that entity.

A faculty member who changes formal appointments during the period under assessment shall be evaluated by both academic units with access to each other's documentation as they see fit.

The faculty member's supporting documents and the unit(s) evaluation(s) shall be sent by each academic unit to the next higher level unit until they reach the executive vice president for academic affairs who – subsequent to action by the University Board on Faculty Promotion and Tenure – shall make a recommendation to the university president in each case.

## EVALUATIVE CRITERIA

### Teaching

Good to excellent teaching shall be the first requirement in decisions at all levels on hiring, retention, promotion and tenure. A positive decision on these matters and on the annual performance review shall require a demonstration of continued improvement of teaching or – where prior assessments indicated sufficiently high quality – the maintenance of past quality.

Teaching evaluations shall be done in some systematic, documented manner and shall include contributions from the candidate's students and peers, although this need not necessarily mean in-class peer review. The faculty member shall also submit course materials and a self-assessment.

Evaluation of teaching shall address the following matters:

- command of materials
- effective communication of subject matter
- appropriateness and thoroughness of objectives
- course content, organization and presentation
- methods of evaluating students
- success in bringing students to an acceptable level of performance and in challenging them to grow intellectually and morally

Instructional activities outside the classroom, such as course development, academic advisement, accessibility to students, supervision of independent study, and contributions to meeting departmental instructional needs shall also be considered.

### Scholarship, Research and/or other Creative Activities

Scholarship, research and/or other creative activities are expected of each faculty member throughout their professional life. For appointments to tenure track positions, there should be strong indications of the candidate's potential for these pursuits. Throughout the probationary years, faculty members should also be able to demonstrate success at completing projects and disseminating the results of these projects in the academic and artistic area beyond DePaul.

Evidence concerning scholarly contributions for the creative products should include:

- a complete professional curriculum vitae
- copies of these contributions when feasible
- assessment of these contributions by professional peers and other experts in the field, and
- self-assessment concerning scholarly growth and development

4

**Definition[1]**

Scholarship encompasses four separate but overlapping functions:

a. the advancement of knowledge through original discovery, usually within the context of a disciplinary field and practice, such that a significant contribution is made to the stock of human knowledge and the intellectual climate of the university;

b. the integration of knowledge through cross- and multi-disciplinary investigations, through placing results of disciplinary research into broader frameworks of interpretation, by discovering the boundaries where older fields of inquiry converge and require a new field to develop;

c. the application of knowledge in responsible ways to consequential problems of contemporary society, the larger community, so that one's scholarly specialty informs and is informed by interactions with that community;

d. the representation and communication of knowledge through the development of pedagogical methods and tools that reflect on and enhance the intellectual community.

**Guidelines and Criteria**

1. Specific instances of scholarship should be evaluated in light of their a) originality; b) contribution to knowledge; c) conceptual or artistic sophistication; d) intellectual rigor or artistic skills; e) effective application of knowledge to address human problems or needs, and; f) effective communication of knowledge to audiences beyond the classroom.

2. If such instances of scholarship are not susceptible to such evaluation, they cannot satisfy the criteria for promotion and/or tenure.

3. Nevertheless, it should be acknowledged that an activity may be evaluated in various ways. For example, an academic unit may evaluate oral presentations by – without limitation – listening to recordings, examining drafts, or soliciting the views of other scholars (including other members of the faculty) who were in attendance. An evaluative body may judge the reliability of the evaluative factors available as to each such activity.

4. The faculty of a department, college or school will determine which forms of scholarship particularly advance and communicate knowledge within a disciplinary or interdisciplinary field and how the products of scholarship will be weighed.

5. Activities conducted solely within a candidate's classes, or designed merely to keep a candidate abreast of scholarly development in a field, should be considered in evaluating a candidate's teaching, not in evaluating whether a candidate has satisfied the standard delineated for scholarship, research and/or other creative activities.

**Service[2]**

**Definition**

Service consists of activities that

1. benefit the university and its academic units, professional associations, or the community;

2. are consistent with the university's mission;

3. require the expertise of the faculty member – either the specialized expertise of the faculty member's field or the general skills possessed by all members of the faculty, and;

4. are provided without full compensation.

Ordinarily, service activities are provided without compensation. Compensated activities are considered to have a service component to the

---

[1] Adopted by Faculty Council – May 3, 1995

[2] Adopted by Faculty Council – February 7, 2001

extent that the compensation is not commensurate with the extent or value of the faculty member's contribution.

**Types of Service**

Service may be provided to the university, to the profession, and to the community in the following ways.

1.   University service consists of contributions to the enhancement of the institution's internal processes and its relationships with external bodies. University service takes place through formal organizational roles, to which the faculty member is elected or appointed, within the university or through appointments by the university to represent it on external bodies. It consists of activities beyond active participation in ordinary governance of the faculty member's home academic unit.

   A partial list of basic categories of university service includes:

   - Extraordinary contributions to the work of committees, boards, working groups, and related entities in the home academic unit;
   - Filling a leadership role in the home academic unit;
   - Work contributed to the meeting of the goals of standing and *ad hoc* committees, task forces, boards, working groups, councils and related entities, at the levels above the faculty member's academic unit;
   - Serving as the appointed liaison or representative of the university to an external institution or as the liaison or representative of an external institution at DePaul.

   Specific examples of service include:

   - Work contributed as a member or chair of a personnel, search or curriculum committee in the home unit;

   - Serving as a departmental chair or program director;
   - Work done as director of undergraduate or graduate studies;
   - Contributions made as a member of a college personnel committee or other standing committees in colleges organized in departments or programs;
   - Serving as an associate dean;
   - Active membership on the Faculty Council;
   - Work done as a member of a standing committee of the Faculty Council;
   - Contributions to the Liberal Studies Council;
   - Contributions to university-wide bodies such as the University Research Council and Quality of Instructional Council;
   - Organizing or making presentations at summer retreats;
   - Active membership on an *ad hoc* panel preparing for re-accreditation;
   - Acting as faculty representative to the Rhodes Scholarship Commission;
   - Serving as DePaul's representative on the Illinois Board of Higher Education.

2.   Professional service consists of contributions to the organizations or associations of the faculty member's academic discipline or the professoriate. Professional service may have a component of scholarship or creative activities.

   Examples of professional service include:

   - serving as an elected officer of a national or regional professional association;
   - serving on a committee or task force of a professional association;
   - editing a professional journal or newsletter;
   - serving as a peer reviewer for a professional journal;
   - organizing a professional meeting or symposium, and;

6

- serving as a peer reviewer on an accreditation process "visiting team."

3. Community service consists of activities that require the faculty member's expertise, either the specialized expertise in the faculty member's field or the general skills possessed by all members of the faculty, and that contribute to the public welfare outside the institution, consistent with the Vincentian tradition of DePaul University.

Examples of community service include:

- Consulting with private, public and religious organizations, provided – as stipulated above – that such consulting not be fully remunerated;
- Providing services to the public through a university clinic or center;
- Giving presentations and performances for the public, provided – as stipulated above – that the activities not be fully compensated;
- Serving on the boards of non-profit organizations and community groups;
- Communicating in popular and non-academic publications;
- Speaking to civic organizations on a matter pertinent to the faculty member's expertise;
- Testifying as an expert witness before a committee of the U.S. House of Representatives or Senate, the Illinois legislature, City Council, or similar governmental bodies.

Activities consistent with a faculty member's expertise but that could be done by someone without that expertise do not count as community service. In some instances it will not be obvious whether an activity counts as community service. In those cases, it is the responsibility of the faculty member under review to make the case demonstrating that the activity should count under these policy guidelines.

**Statement of Expectations**

University Service
The university is not a collection of individuals working in isolation. Instead, it is a community whose vitality depends on the voluntary efforts of the faculty collaborating to promote the common good. Many of these efforts are channeled through a multiplicity of committees, councils, boards, task forces, and similar structures that collectively comprise the infrastructure of the institution. All faculty members are expected to participate in the collective life of the university, especially through the constituent part of its infrastructure.

All faculty members must serve in their home academic unit, unless assigned to a position such as associate dean that precludes such service. The amount of service is correlated with academic rank, with senior faculty expected to provide the greatest amount of service and to provide leadership. All faculty also are expected to serve beyond the home unit level. That is a basic obligation attendant to the status of faculty member. In large colleges, the requirement for service beyond the home unit may be fulfilled by service to the college. In small units, the expectation of service beyond the home unit will take into consideration the level of service to the home unit required of the faculty member. Service beyond the home unit is not a formal requirement for tenure and promotion to the rank of associate professor. However, a substantial service record beyond the home academic unit strengthens the case for tenure and promotion to the rank of associate professor. Some service beyond the home unit is a requirement for promotion to full professor.

Faculty members have the responsibility to seek opportunities for service beyond their home unit. Administrators charged with the development of faculty are obliged to encourage and to facilitate faculty involvement beyond the home unit level.

Those who are responsible for assessing faculty performance must consider the extent of service performed at the home unit level when assessing the overall service record. Faculty members who have been engaged in time-consuming service at

the home unit over a period of years cannot be expected to have sustained a substantial amount of professional or community service or university service beyond the home unit. When a faculty member's exemplary service at the home unit is to be a factor in the evaluation of the faculty member's performance by a higher unit (e.g. by the academic dean or college personnel for faculty in a department or by the University Board on Faculty Promotion and Tenure by all faculty), the administrator (chair, director, academic dean) or personnel committee of the home unit must provide narrative detailing the candidate's exemplary service at the home unit.

### Professional Service

Professional service is not required, but is to be rewarded in annual evaluations for salary adjustment and to be considered in tenure and promotion decisions. The weight to be given to professional service depends on the application of the set of criteria described below.

### Community Service

Community service is not required, but is to be rewarded in annual evaluations for salary adjustment and to be considered in tenure and promotion decisions. The weight to be given to community service depends on the application of the set of criteria described below.

### Documentation

At the point of any personnel decision affecting a faculty member, the faculty member is to present a full report on service activities. The report must include a) a brief explanation of the nature of the service; b) a description of the time and effort invested in the service activity, such as the frequency of meeting, preparation time, etc.; c) the accomplishment of the service activity, such as reports produced, decisions made, etc.; d) a description of one's own contributions to the collective accomplishment; and, e) supporting documentation.

At the point of major personnel decisions – formal reviews for re-appointment of untenured faculty, tenure and promotion – the faculty member, the departmental chair or program director, or the chair of the personnel committee in the home

academic unit must solicit an evaluation of the faculty member's service contributions from the chairs of committees or other university service venues on which the faculty member served. Similarly, letters documenting professional and community service contributions should be solicited. Given the time constraints on the leaders of many external organizations, though, the absence of such letters should not be considered grounds for discounting the significance of professional and community service.

### Criteria for Evaluation

The following criteria shall be applied when evaluating the quality of service. They shall be applied holistically as a set. Not all criteria need to be met for an activity to be evaluated as high quality service.

1. Importance and quality of individual contribution. Other things being equal, activities that make a distinctive contribution carry more weight than do other activities. Thus effectively filling leadership roles (e.g. chairing a committee) carry more weight than do other roles. Activities carried out in informal roles can make contributions as important as those provided by those in leadership roles. For example, a person who drafts a lengthy report or other document is making an important contribution even if it is not designated as a formal role. Other examples of informal leadership would be representation of the unit at public functions, initiating changes and steering them to fruition, serving as a bridge to other units, and willingly volunteering for necessary but otherwise thankless tasks.

2. Impact or significance of the service. Other things being equal, service contributions that have substantial and important consequences in the setting in which the service takes place carries more weight than does work that does not have important consequence.

3. Time on task. Other things being equal, the greater the work load of the service, the more weight it carries.

4. Intellectual work. Other things being equal, service activities that involve extensive application of expertise, acquisition of new knowledge, etc., carry greater weight than do service activities that involve less.

5. Interaction of service, teaching, and scholarship. Other things being equal, service activities that develop new teaching and scholarly competencies, new information, or new technology or research agendas count more than activities that do not.

6. Communication and dissemination. Other things being equal, service work that leads to publication or communication of findings carries more weight than does other kinds of work.

## Distinctive and Significant Contributions[3]

In a case where the faculty member has made a distinctive and significant contribution to the university or its mission, this contribution shall be weighed heavily regardless of which category it falls into (e.g. teaching and learning; scholarship, research, and/or creative activities; or service).

## PROMOTION: SPECIFIC CRITERIA BY RANK

### General Criteria

The principal criteria for initial appointment and promotion in academic rank are quality of teaching and learning; scholarship, research, and/or creative activities; and service.

General university criteria are subject to further specification standards adopted by colleges, schools and departments. Criteria that are approved by and included in official documents of the academic units are as binding on the members of those units as are the general university standards for which they provide explication. Should there be a difference between the two sets of criteria, those of the university shall prevail.

A faculty committee within the originating college or school should prepare a written policy for promotion and tenure including definitions, goals, and importance of the three fundamental areas of academic performance for that unit's faculty members. This document should reflect the input of the various departments in that college or school.

The University Board on Faculty Promotion and Tenure shall review the criteria prepared by the college, school and department. The Board shall determine whether said policies are consonant with the general university policy on promotion and tenure. If the Board finds college or school policies to be inconsistent with university guidelines, it will so inform the academic unit with the expectation that the academic unit shall revise criteria accordingly.

### Assistant Professor

The doctorate or terminal degree is required for this rank. Exceptions are made for candidates who have already attained recognition for scholarly or other relevant professional achievements and give promise of continued academic development. The assistant professor should demonstrate a potential for becoming a good to excellent teacher, for pursuing scholarship, research, and/or other creative activities, and service.

### Associate Professor

In addition to the requirements for assistant professor, the candidate must demonstrate good to excellent teaching performance. The candidate should also show evidence of notable scholarship, research, and/or creative activities, and service. The candidate should be engaged in scholarly endeavors that are likely to result in additional academic achievements. For this rank, the candidate should show significant involvement in university activities at the respective college, school or departmental level.

### Professor

This rank is reserved for those with recognized academic achievements. In addition to the requirements for associate professor, candidates must give evidence of continued scholarship,

---

[3] Adopted by Faculty Council – May 3, 1995

research, and/or creative activities – the quality of which is recognized by their peers outside the university. For promotion to full professor, an evaluation of the candidate's scholarly or creative record by a minimum of two external experts who have been sent the appropriate materials as required. These evaluations should be from persons not overly influenced by personal relations with the applicant. Candidates for this rank should also present evidence of notable service contributions to the university at a level of their home academic unit and beyond. Good to excellent teaching remains mandatory for this rank.

## TENURE

### Contract Rights

Continuous contract rights at DePaul University are given to faculty members who have attained tenured status as provided for in this Faculty Handbook. Faculty members employed under continuous contract are entitled to annual contract renewal and shall be subject to the terms and conditions of employment that exist at the time of each annual performance review, unless separated pursuant to the provision of the SEPARATION section of this Faculty Handbook.

### Eligibility

Only a faculty member with a tenure track appointment is eligible for tenure. The basis upon which tenure is granted or denied tenure are:

1. Academic Qualifications

   Before granting tenure, the university should have no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission.

2. Length of Service

   As a general norm, the university requires seven (7) years of continuous service with a regular full time appointment at DePaul. This length of time is reduced for the faculty member whose initial appointment is at the

rank of professor or associate professor. The seven years may also be reduced by one, two, or three years by the institution's recognition of a previous full time faculty appointment at another college or university. For this previous service to be applied in reducing the length of service at DePaul, the prospective faculty member and the university must reach an agreement that will be included in the initial faculty contract. This contract, therefore, will indicate the number of probationary years of service before the faculty member is eligible for tenure at DePaul University. If, during this probationary period, a faculty member is on leave of absence for one quarter or longer, the year during which the leave occurs is not considered as a year of probationary service, unless the contrary is explicitly provided for in writing by the executive vice president for academic affairs in granting the leave. The leave does not break the required continuity of service even when the year is not part of the probationary period.

As a general norm, the years a faculty member has spent at DePaul University with a special full time appointment (e.g. non tenure track appointments as instructor or visiting, or years spent as instructor (ABD)) are not calculated as satisfying the required probationary years. If the faculty member's status is changed from a special to a regular full time appointment, one or more years spent in a special appointment may be calculated to satisfy the years of probationary service required assuming the negotiation is agreed upon by the academic dean and the executive vice president for academic affairs.

Faculty members in advanced academic ranks who have not yet completed the required years of service are eligible to apply for tenure as follows:

Faculty members joining the university at the rank of full professor are usually offered tenure with the initial contract. However, those full professors who are not offered tenure with the initial contract shall have one formal probationary evaluation – the one

before December 15th of the second year of service. This evaluation will decide whether the professor will be granted tenure or not offered renewal of contract after the second year.

Faculty members joining the university at the rank of associate professor shall have a minimum of two formal probationary evaluations, the last evaluation leading to the decision to grant or deny tenure. If tenure credit is given upon initial appointment, the specifics of the review process will be identified in the letter of offer.

3.  Needs of the University or Academic Unit

    In planning the number and qualifications of faculty to meet future needs and the resources required to support the faculty, the university may – after consultation with the faculty – limit the number of tenured positions in the university or in any of its academic units. In such instances, tenure would not be granted regardless of the faculty member's qualifications and length of service.

**Externally Supported Appointments**

Faculty members with special full time appointments in positions funded by non-university resources are not eligible for tenure. This restriction is part of the faculty contract.

**Denial of Tenure**

The faculty member with a regular full time appointment who is not granted tenure after completing the years of probationary service required for a tenured appointment (normally seven years), will not be offered a contract renewal at DePaul.

**Termination of Tenured Appointments**

The university may terminate a tenured faculty member for reasons of financial exigency, the need to discontinue or substantially reduce the size of an academic unit or program, for cause of medical disability, or for cause of gross or negligent violation of university standards and

expectations. (*See* **SEPARATION** *for full explication.*)

**PROCEDURES AND TIMETABLE FOR PROMOTION AND TENURE**

**Process**

Each year, eligible faculty may apply for tenure and/or promotion in academic rank. On or before May 15th, the executive vice president for academic affairs will notify eligible faculty in writing of the deadline for submitting an application for promotion and/or consideration of tenure. The faculty member's request must be submitted to the departmental chair, academic dean, and the executive vice president for academic affairs on or before September 15th. Failure to meet this deadline postpones an application for promotion until the next academic year. In cases of tenure consideration (with or without promotion), failure to apply during the year of a faculty member's eligibility or a withdrawal from consideration will result in the forfeiture of tenure rights and the termination of the faculty member's appointment at the end of the next academic year.

The executive vice president for academic affairs will acknowledge receipt of the application no later than September 30th and will advise the candidate for promotion only that the right to withdraw an application for promotion is active at any time and can be made without prejudice for future applications.

A faculty member is normally expected to serve three to six years, depending on the practice of the relevant college or school, in a given rank before promotion to the next rank. Exceptions to the norm are allowed when the dean and/or college personnel committee, where it exists, certify that the candidate's extraordinary performance, according to departmental, college or school criteria, warrants early promotion in rank, and the University Board concurs. There is no limit to the number of times a faculty member may apply for promotion to full professor. In the event of a negative recommendation, however, the faculty member is strongly urged to refrain from re-

applying for at least one year after the negative recommendation. Requests for tenure submitted before the year of eligibility will not be accepted.

All tenured faculty members of a candidate's home academic unit are permitted and expected to vote by a secret ballot at a meeting in which the candidate's application is reviewed and discussed, exempting those faculty who may be unable to participate due to approved leaves of absence. For those departments, colleges or schools that utilize a personnel committee at the initial level of review, the personnel committee shall draft a recommendation that will be distributed to all tenured faculty members prior to the meeting. If there are an insufficient number of tenured faculty available at the departmental or college stages, a dean may appoint tenured faculty to the review process from other related academic units. Untenured, tenure track faculty will be given the opportunity to participate in the review process, but do not have the right to vote. The unit may follow a standing policy of restricting voting for promotion to persons of equal rank or higher, provided there is a critical mass of faculty at that rank or higher.

The report on the recommendation from the home academic unit shall fully discuss both strengths and weaknesses in the record so as to provide an explanation for positive and negative votes. All faculty participating in the decision will read the final report of the unit's recommendation and sign one of two forms:

- One stating that the faculty member agrees that the report accurately represents the discussion of the unit, or
- Another stating that the report does not accurately reflect the discussion of the unit.

The faculty member's signature does not indicate the direction of the signatory's vote. Faculty who sign the form indicating lack of agreement must provide a signed written statement of their reasons. In the event a faculty member refuses or is unable to sign one or the other of the two forms above, the report will go forward with an explanation from the person responsible for gathering the signatures.

Review of qualifications for promotion and tenure is in four stages. At each stage:

- The numerical vote of the reviewing body must be reported at all subsequent levels;
- Minority or other reports will be filed with the next higher level only when the candidate has had the opportunity to review such reports in order to respond appropriately. Minority and/or dissenting reports must provide explicit explanations and rationale;
- All documents considered at any level shall be passed on to subsequent levels. The candidate shall have access to all internal documents being considered;
- The candidate shall be informed by the departmental chair and/or academic dean of the decision, numerical vote, and all of the grounds for the decision before moving on to the next level;
- Applicants for promotion and/or tenure may continue to the next stage of deliberation, regardless of the recommendation(s) at any prior stage;
- Any reversal of the decision of a prior level shall be reported promptly to the departmental chair and/or academic dean of the prior level along with the reasons for the reversal.

The first stage of the review is conducted by the department or, in the absence of a departmental structure, another appropriate initial review body (personnel committee, faculty of the whole and/or academic dean) according to its established procedures. A student representative(s) chosen by the appropriate selection procedures established by the college and/or Student Government Association shall participate in the review at this level and be present to answer questions regarding his or her written report at the hearing of the University Board on Faculty Promotion and Tenure. The student representative shall be prepared to fulfill these responsibilities by the department chair, the chair of the personnel committee, or the academic dean as appropriate.

The student representative's involvement in the promotion and tenure process is limited to consideration of the faculty member's teaching performance. The student representative shall

retain the right to vote and the focus of the student representative's responsibility will be to speak intelligently regarding the faculty member's teaching record and to carefully reflect the perception of other students.

The elected student representative will make a presentation to the departmental or college personnel committee concerning the faculty member's teaching. Following a discussion with the committee on the teaching record, the student will cast his or her vote, which will remain secret and be counted with all other votes at the appropriate time. The student may then be excused for the rest of the deliberation. Should the student be permitted to stay, his or her vote may be cast at the same time as all other voting members.

The student representative should prepare his or her presentation by reviewing both the quantitative and substantive data from the course evaluations as well as collecting additional student opinion by means of an open, representative information gathering process in accordance with standing policies of the academic unit. It should be stressed to the student representative that he or she is not participating in this process as an advocate for the candidate, but rather as a representative of the student body, commenting on the effectiveness of the candidate's teaching. The focus of the student report should be on the interpretation of the student evaluations, particularly noting areas of discrepancy that might exist between the written evaluations and the result of the student survey. A written student report should be submitted as part of the materials presented in support of the candidate's application. The candidate should have the opportunity to review this report prior to appearing before any review board at any level.

The unit may, when deemed necessary, invite faculty from other units to participate in the review process at this level. It is especially important at this stage that the reviewing body critically assess all data concerning the candidate's disciplinary and/or area of qualifications. At this stage, the burden of presenting a convincing case for promotion and/or tenure lies with the department and/or college,

rather than with the candidate. The departmental or school recommendations must be substantive and provide specific, concrete examples to support the positive or negative decision. These recommendations will explicitly identify the strengths and weaknesses of each given case as evidence for the recommendation. Failure on the part of the department, college or dean to provide clear rationale weakens the recommendations at the university level and may result in the next level's decision to postpone action for a year on the recommendation. On or before January 15th, the recommendations of the department, program or school shall be submitted to the office of the dean.

The academic dean of the respective college or school conducts the second stage of the review. In this process, a college or school personnel committee may advise the dean. The dean has the responsibility for submitting a comprehensive review of each candidate. When the dean's decision differs from that of the tenured faculty, college or school personnel committee (where one exists) or departmental recommendation, the dean shall inform all involved parties of his or her decision and the underlying reasons. The dean's formal recommendation to the University Board on Faculty Promotion and Tenure shall also explicitly cite the reasons that comprise his or her recommendation. Regardless of whether they are in accord, the dean and the college or school personnel committee may submit separate recommendations, if desired. The dean's recommendation, the recommendation and numerical vote of the personnel committee, along with the candidate's supporting material are to be submitted to the executive vice president for academic affairs on or before the appropriate date as specified for a specific college or school (see below).

The third stage of the review is by the University Board on Faculty Promotion and Tenure, which meets during the spring quarter. The executive vice president for academic affairs makes a recommendation to the president based on the university board's decision.

The president of DePaul University shall make final decisions regarding promotion and/or the

granting of tenure. On or before June 15th, faculty members will be given written notification of the president's decision. In cases of a negative decision, the president will include in the written notification the reasons for such a decision.

Tenure and/or promotion, when granted, become effective at the beginning of the first full academic year following the decision. If tenure is denied, the faculty member's appointment will terminate at the conclusion of the contract for the following academic year that was previously issued.

Only in rare instances and for compelling reasons will the president overturn a promotion or tenure recommendation made by the University Board on Faculty Promotion and Tenure.

## Supporting Materials

In promotion and tenure cases the University Board on Faculty Promotion and Tenure shall receive the following and other relevant materials:

- Complete professional curriculum vitae for the applicant, paginated with the applicant's name on each page;
- A 5 to 8 page statement in which the faculty member emphasizes those achievements or qualifications to which the board should particularly attend;
- Evidence of teaching effectiveness;
- The written recommendation(s) from the reviews conducted at prior levels;
- For promotion to full professor, an evaluation of the record of the candidate's scholarship, research, and/or other creative activities by a minimum of two (2) external experts who have been sent the appropriate materials.
- Other evidence the applicant may wish to submit, i.e., summary of course evaluations, awards, and special recognitions; and
- A single copy of articles, papers, published manuscripts, etc.

Ordinarily, materials submitted to the University Board are limited to that used in the college or department review.

## University Board on Faculty Promotion and Tenure

The University Board on Faculty Promotion and Tenure shall be appointed by the Faculty Council and be comprised of seven (7) voting faculty members. The seven faculty members will be broadly representative of different areas of inquiry. Only tenured professors are eligible to serve as representatives of the board. Associate deans are not eligible. Appointments to the board will be staggered; each appointment will be for a three (3) year term. The executive vice president for academic affairs shall serve as the convener and a non-voting member of the board.

The board shall have the following responsibilities:

1. to apply current university-wide standards and criteria for tenure and promotion;
2. to review: a) the candidates application and supporting materials, b) recommendations from prior levels, and c) the application of departmental and/or college criteria to the candidate;
3. to recommend action for tenure and/or promotion of the candidate;
4. to review college/school guidelines and criteria to insure consistency with stated university expectations as well as reasonable application of these criteria to the evaluation of faculty members.

At the conclusion of each year's proceedings, the members of the board shall make recommendations to the executive vice president for academic affairs regarding the board's future functioning. The executive vice president for academic affairs shall refer any policy issued raised by board members to the Faculty Council and will make available a statistical summary of the final decisions to the faculty of the university.

## University Promotion and Tenure Schedule

The following is the suggested schedule for the university promotion and tenure process. Whenever possible, the university will abide by the proposed time table.

**May 15**
Letter of notification as to the eligibility to apply for promotion and tenure sent to the faculty member from the executive vice president for academic affairs.

**September 15**
Letter requesting consideration for promotion and/or tenure submitted by the faculty member to the executive vice president for academic affairs, the academic dean, and the head of the academic unit.

**January 15**
Report from the academic unit submitted to the academic dean.

**January 31**
Report from the academic dean and the academic unit of the following colleges and schools submitted to the executive vice president for academic affairs

- School of Computer Science, Telecommunications and Information Systems
- School of Education
- College of Law
- School of Music
- School for New Learning
- The Theatre School

**March 1**
Report from the academic dean of the College of Commerce and all relevant materials submitted to the executive vice president for academic affairs.

**March 15**
Report from the academic dean of the College of Liberal Arts and Sciences and all relevant materials submitted to the executive vice president for academic affairs.

**Winter/Spring Quarter**
University Board on Faculty Promotion and Tenure meet with faculty candidates.

**June 15**
Decision of the university president. Notification of the president's decision will follow in a timely fashion.

**Exhibit B**

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 440-2009-01066 |

| Illinois Department Of Human Rights | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)*<br>**Mr. Jami Montgomery** | Home Phone *(Incl. Area Code)* | Date of Birth<br>**07-07-1963** |
|---|---|---|

| Street Address | City, State and ZIP Code |
|---|---|
| **5238 South Michigan Avenue, Chicago, IL 60615** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name<br>**DEPAUL UNIVERSITY** | No. Employees, Members<br>**500 or More** | Phone No. *(Include Area Code)* |
|---|---|---|
| Street Address<br>**1 East Jackson,  Chicago, IL 60604** | City, State and ZIP Code | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| Street Address | City, State and ZIP Code | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN<br>☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER *(Specify below.)* | Earliest                    Latest<br>**06-03-2008**<br>☐ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I was hired by the Respondent in March 2002.  I am employed as an Assistant Professor.  During my employment, I engaged in protected activities.  On or about June 3, 2008, I was denied a promotion and tenure, whereas similarly situated, non-Black Assistant Professors were treated more favorably.

I believe that I have been discriminated against because of my race, Black, and I was retaliated against for engaging in protected activities, in violation of Title VII of the Civil Rights Act of 1964, as amended.

*RECEIVED EEOC*

*NOV 21 2008*

*CHICAGO DISTRICT OFFICE*

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Nov 21, 2008**              *J. Montg*<br>Date                          *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

**Exhibit C**

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

To:  **Jami Montgomery**
     **5238 South Michigan Avenue**
     **Chicago, IL 60615**

From:  **Chicago District Office**
       **500 West Madison St**
       **Suite 2000**
       **Chicago, IL 60661**

**CERTIFIED MAIL 7001 0320 0005 8565 9715**

☐  *On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **440-2009-01066** | **Amy Burkholder,**<br>**Investigator** | **(312) 353-8906** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII or the ADA **must be filed in a federal or state court** <u>WITHIN 90 DAYS</u> **of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a state claim may be different.)

[X]  More than 180 days have passed since the filing of this charge.

[ ]  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[ ]  The EEOC is terminating its processing of this charge.

[X]  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

[ ]  The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court** <u>WITHIN 90 DAYS</u> of your receipt of this Notice.  Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]  The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):**  You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred** <u>more than 2 years (3 years)</u> **before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*John P. Rowe* (signature)                    11/19/09

**John P. Rowe,**
**District Director**
                                        *(Date Mailed)*

Enclosures(s)

cc:  **DEPAUL UNIVERSITY**