UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMI MONTGOMERY, | ) | |
| | ) | |
| Plaintiff, | ) | 10 C 78 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| DEPAUL UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Dr. Jami Montgomery, an African-American man, was a tenure-track assistant professor at DePaul University. DePaul rejected Montgomery's application for tenure, and it later refused to rehire him to an adjunct teaching position he had obtained and held for a brief period after being denied tenure. Montgomery brought this suit against DePaul, claiming that it had discriminated against him on the basis of race in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.; retaliated against him in violation of Title VII and § 1981 for engaging in activity protected by those two statutes; and breached obligations to him created by DePaul's Faculty Handbook, in violation of state contract law. DePaul has moved for summary judgment. The motion is granted as to all of Montgomery's claims, except for the claim that DePaul refused to rehire Montgomery as an adjunct in retaliation for his filing this suit, which initially complained only of the denial of tenure.

### Background

**A.    DePaul's Hiring of Montgomery**

DePaul hired Montgomery as a visiting professor in its School of Computer Science, Telecommunications, and Information Systems ("the School") in 2002; a few months later,

DePaul made him a tenure-track assistant professor. Doc. 74 at ¶ 3. (The School later was renamed the College of Computing and Digital Media, *id*. at ¶ 5, but the change is irrelevant to this case and thus will be ignored.) Montgomery's probationary period, or "tenure clock," was six years. *Id*. at ¶ 6. At the end of that period, he would be eligible to apply for tenure, and if he failed to win tenure, he would not be allowed to continue as an assistant professor. *Id*. at ¶ 21; Doc. 75-2 at 25, 34.

Upon joining DePaul, Montgomery signed a Contract of Faculty Employment, which provided that "[t]he Faculty Member agrees to devote his or her full time and best efforts to the discharge of designated duties, to engage in employment outside the University only under conditions stipulated in the University's Faculty Handbook, as from time to time amended, and to fulfill the other obligations of the DePaul faculty as described in this same Handbook." Doc. 74 at ¶ 9; Doc. 75-3 at 1. The Faculty Handbook imposes several restrictions on outside employment: it requires that paid outside activities not exceed one day per week over the course of a year, further requires that employees submit an annual report of outside employment, and provides that a "material violation" of the outside employment policy could lead to termination. Doc. 74 at ¶¶ 8, 10-11; Doc. 75-2 at 63-64. Yet throughout his probationary period, Montgomery held a full-time job with an annual salary of $100,000 at Lucent Technologies, despite having stated on the curriculum vitae he gave to DePaul that he had worked for Lucent only through 2002. Doc. 74 at ¶ 7, 15. Dr. Helmut Epp, who was dean of the School when Montgomery was hired and had become DePaul's provost by the time Montgomery applied for tenure, testified at his deposition that he "would have immediately terminated [Montgomery] had he known of his employment with Lucent." *Id*. at ¶ 13. The School's current dean, Dr. David

Miller, testified similarly. *Id*. at ¶ 14. But DePaul apparently was unaware of Montgomery's outside employment prior to this litigation.

**B.  Montgomery's Diversity Advocacy and Assistance to Terminated Colleagues**

During his time at DePaul, Montgomery urged the university to increase its efforts to achieve a racially diverse faculty. He helped to establish and then chaired a Diversity Committee at the School. *Id*. at ¶ 58. While his tenure application was under review, Montgomery told the University Board on Faculty Promotion and Tenure ("UBPT") that he thought his role with the Diversity Committee was one of his greatest services to DePaul. *Id*. at ¶ 64. Montgomery also discussed with Deans Epp and Miller the need for greater diversity in the School. *Id*. at ¶ 66. At a public meeting regarding Epp's application to be promoted to provost, Montgomery asked Epp by what mechanisms university officials should be held "accountable" for improving diversity; Epp replied that increasing diversity was an important goal, but that Montgomery's language about holding individuals accountable was "too strong"; when Montgomery pressed him further on the lack of tenured African-Americans at the School, Epp turned red, ignored Montgomery, and began taking questions from other faculty members. *Id*. at ¶ 56; Doc. 81 at ¶ 43; Doc. 78-5 at 21-24.

Montgomery recognizes that DePaul has instituted several university-wide diversity initiatives and has been recognized for its diversity efforts by Diversity MBA Magazine. Doc. 74 at ¶¶ 61-62. And he does not allege that he was subjected to racially discriminatory language by anyone at DePaul, with the sole exception of joking racial references from a colleague named Steele; Montgomery admits that Steele is his friend and that he did not feel discriminated against by Steele's comments. *Id*. at ¶ 51. Montgomery points out that Epp showed a racially offensive clip from the film *Birth of a Nation* during a meeting, but he admits that the context was a

lecture by Epp on the history of digitization and that the clip was actually a ten-second portion of a two-minute excerpt that Epp screened from Martin Scorsese's *History of the Cinema*. *Id*. at ¶¶ 49-50. Although he was aware of the procedure for doing so, Montgomery never filed an internal complaint for discrimination or retaliation during his time at DePaul. *Id*. at ¶ 68.

Montgomery also offered various forms of support to several DePaul employees who were terminated by the university. He helped an African-American colleague who had been fired by DePaul to seek adjunct employment there, though he never suggested to anyone affiliated with DePaul that the colleague had suffered discrimination. *Id*. at ¶ 54. Montgomery advised a former adjunct to file a complaint alleging sex discrimination, though he never told this to anyone affiliated with the university, and he did not himself make a complaint or participate in an investigation of his colleague's termination. *Id*. at ¶ 67.

### C. Montgomery's Tenure Application

At the end of his probationary period, during the 2007-2008 academic year, Montgomery applied for tenure. *Id*. at ¶ 6. According to the Faculty Handbook, the criteria for tenure decisions are the quality of the candidate's (1) teaching, (2) scholarship and research, and (3) service to the university. *Id*. at ¶ 16; Doc. 75-2 at 26-33. The Handbook provides that a candidate must pass through four layers of review to be awarded tenure: (1) the candidate's department; (2) the dean of his school or college; (3) the UBPT, which has seven members; and (4) the university president. Doc. 74 at ¶ 17; Doc. 75-2 at 34-38. In a passage quoted in the Discussion section of this opinion, the Handbook provides that the president should overturn the UBPT's decision only under compelling circumstances, but that otherwise one level of review should make its own independent application of the tenure criteria if it finds the previous level's decision to be deficient in significant respects. Doc. 74 at ¶¶ 19-20; Doc. 75-2 at 37.

-4-

The faculty of Montgomery's department voted 26 to 7 in favor of awarding him tenure, and Dean Miller endorsed that recommendation. Doc. 74 at ¶ 22. But the UBPT voted 5 to 1 against Montgomery (the seventh member was absent), and the president accepted the UBPT's recommendation and denied Montgomery tenure. *Id*. at ¶¶ 35, 37; Doc. 75-5 at 5. The UBPT expressed concern about the seven "no" votes Montgomery had received from his departmental colleagues, and noted that even among the 26 who voted for him, only nine thought his scholarship was strong. Doc. 75-5 at 5. Although some of Montgomery's peers had also criticized his teaching effectiveness, the UBPT concluded that his teaching was "good" and therefore met the Handbook's minimum requirements for teaching. *Ibid*. The UBPT viewed Montgomery's service to the university as "strong," but explained that a strong service record cannot make up for teaching and research that "appear to be weak or, at the best, minimally meeting requirements." *Ibid*.; Doc. 74 at ¶ 36. The president repeated the UBPT's rationale in adopting its recommendation and denying tenure. Doc. 74 at ¶ 37; Doc. 75-6. Although Montgomery initially alleged that Epp, who by then had become provost, discriminated against him on the basis of race by recommending to the president that he be denied tenure, he now admits that Epp merely played the ministerial role of transmitting the UBPT's report to the president; the evidence shows that Epp did not participate in the UBPT's deliberations on Montgomery's application or the drafting of its report. Doc. 74 at ¶¶ 43-45.

### D. Montgomery's Employment as an Adjunct

After being denied tenure, Montgomery was hired by Dr. Kevin Stevens of DePaul's School of Accountancy and Management Information Systems as an adjunct faculty member to teach a winter 2010 accounting course. *Id*. at ¶ 71; Doc. 81 at ¶ 44. Stevens hired Montgomery after learning, with only ten days before the position had to be filled, that the faculty member set

to teach the course would be unable to do so for medical reasons. Doc. 74 at ¶ 72. Montgomery was paid $7500 along with a tuition reimbursement for about $3000. *Id*. at ¶ 71. At the time Stevens hired Montgomery, Stevens was unaware that Montgomery had filed with the Equal Employment Opportunity Commission ("EEOC") an administrative charge against DePaul alleging race discrimination. Doc. 81 at ¶ 49. In January 2010, when Montgomery began teaching his course, he filed this suit, which at its inception concerned only the tenure denial. When Stevens learned of the suit shortly thereafter, Doc. 81 at ¶ 50; Doc. 74 at ¶ 75; Doc. 78-1 at 1, he emailed Epp: "I just heard about Jami's suit—this is news (and not good news) to me. … Sorry about this. We will of course not hire him back in Spring." Doc. 78-1 at 1.

Stevens carried through: he did not rehire Montgomery, who had no further employment at DePaul after the winter 2010 term. Doc. 78-5 at 32-33. Stevens told Montgomery that Epp had told Stevens that it was a bad idea for Stevens to rehire Montgomery due to Montgomery's pending suit against DePaul. Doc. 81 at ¶ 50; Doc. 78-5 at 34. At his deposition, Stevens offered this explanation for his decision not to consider Montgomery for future openings:

> After I heard that the lawsuit had been filed, I didn't want to have a faculty member in there who felt so strongly about—so strongly negatively about the university. I didn't think it was appropriate to have a faculty member in the classroom who was—felt wronged by the university. I also felt it put the faculty in a—it was choosing sides on my part, which I was not willing to do. We are a very collegial school and it would be very difficult to have someone who's suing, who was that unhappy to be in the school.

Doc. 78-9 at 24.

## Discussion

Montgomery's suit brings four claims: (1) DePaul discriminated against him on the basis of race in denying him tenure, in violation of Title VII and § 1981; (2) DePaul denied him tenure in retaliation for his advocating racial diversity and assisting fired colleagues, also in violation of

Title VII and § 1981; (3) DePaul refused to rehire him for further adjunct employment in retaliation for filing this lawsuit, again in violation of Title VII and § 1981; and (4) DePaul did not adhere to certain provisions of the Faculty Handbook in considering his tenure application, in violation of state contract law.  DePaul is entitled to summary judgment on the first, second, and fourth claims, but not the third.

## I.    Race Discrimination – Denial of Tenure

As just noted, Montgomery claims that DePaul discriminated against him on the basis of race in violation of Title VII and § 1981 when it denied him tenure.  The two statutes differ in scope and in their procedural and remedial provisions, but they require the same analysis on the merits, *see Smith v. Bray*, 681 F.3d 888, 895-96 & n.2 (7th Cir. 2012), and so for purposes of this opinion they will be treated as one.  Under both statutes, a discrimination plaintiff may oppose summary judgment under the direct and indirect methods of proof.  *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012); *Rodgers v. White*, 657 F.3d 511, 516-17 (7th Cir. 2011).  Montgomery pursues only the indirect method.  Doc. 72 at 3-9.

The indirect method has three steps.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  First, the plaintiff must make a prima facie case of discrimination, which, in the context of tenure denial, requires that he establish that: "(1) he is a member of a protected class; (2) he was qualified for tenure; (3) he was denied tenure; and (4) a similarly situated applicant not in the protected class was granted tenure." *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 814 (7th Cir. 2007); *see also Adelman-Reyes v. St. Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007).  Second, if the plaintiff makes a prima facie case, the burden shifts to the defendant, which must offer a nondiscriminatory reason for denying the plaintiff tenure.  *See Adelman-Reyes*, 500 F.3d at 665; *Sun*, 473 F.3d at 814.  Third, if the defendant meets that

burden, the burden shifts back to the plaintiff, who must provide evidence that the defendant's stated reason is pretext. *See Adelman-Reyes*, 500 F.3d at 665; *Sun*, 473 F.3d at 814. "Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 733-34 (7th Cir. 2011) (alteration in original) (internal quotation marks omitted); *see also Adelman-Reyes*, 500 F.3d at 666.

"The prima facie case and pretext inquiries often overlap; [a court] may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext if the defendant offers a nondiscriminatory explanation for its employment decision" and if the plaintiff's failure to rebut that explanation provides a sufficient ground for granting summary judgment to the defendant. *Adelman-Reyes*, 500 F.3d at 665; *see also Sun*, 473 F.3d at 814 (noting that "the second prong [of the prima facie case] is inextricably intertwined with the pretext analysis"); *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 966 (7th Cir. 1998) (addressing pretext without first determining whether the plaintiff had made a prima facie case). DePaul has set forth a nondiscriminatory reason for denying tenure: that upon consideration of Montgomery's record, the UBPT determined that his research was weak; that his teaching was "good" and therefore minimally meeting requirements; that although his service was "strong," it did not overcome his other deficiencies; and therefore that he did not merit tenure, a conclusion with which the president agreed. Doc. 74 at ¶¶ 35-37; Doc. 75-5 at 5. In seeking to show that DePaul's explanation is pretextual, Montgomery makes four arguments. Doc. 72 at 5-9.

First, Montgomery points out that he met minimal standards for tenure in two of three areas—service and teaching—and argues that this means he was qualified for tenure, which raises an inference that DePaul's rationale for denying him tenure is pretextual. This argument

does not rebut (and indeed is consistent with) DePaul's explanation, which is that *even though* Montgomery's service was strong and his teaching was good, his scholarship was so weak that he did not merit tenure despite his other attributes. Montgomery points to the School's personnel policies and procedures, which state that "[a] positive report [regarding an applicant for tenure] requires high quality performance in at least two of the areas [research/scholarship, teaching, and service], and no major failings." Doc. 75-1 at 3. From this, he contends that he merited tenure because he met minimal requirements in two areas, teaching and service. Doc. 72 at 6-7. But "minimally meeting requirements," which is how the UBPT judges Montgomery's teaching, falls far short of "high quality performance," the metric set forth in the School's policies and procedures. The UBPT felt that Montgomery's teaching and research were decidedly not of "high quality," and so its conclusion did not conflict with the School's policy, making implausible any inference of pretext on that ground.

As the Seventh Circuit has observed, "tenure decisions are often based on the distinction between competent and superior achievement." *Vanasco*, 137 F.3d at 968 (internal quotation mark omitted). DePaul drew that distinction in Montgomery's case, and even if it could validly have decided the other way and granted him tenure, that does not suggest that the reasons it gave for its decision are lies. *See Blasdel v. Northwestern Univ.*, 687 F.3d 813, 815 (7th Cir. 2012) ("practical considerations make a challenge to the denial of tenure at the college or university level an uphill fight—notably the absence of fixed, objective criteria for tenure at that level") (citing cases); *Vanasco*, 137 F.3d at 968 ("[Tenure] decisions necessarily rely on subjective judgments about academic potential. Experience faculty members may well come to different conclusions when confronted with voluminous and nuanced information about a colleague's overall capacity to make a long-term institutional contribution. … [W]e must not second-guess

the expert decisions of faculty committees in the absence of evidence that those decisions mask actual but unarticulated reasons for the University's action.").

Second, Montgomery argues that in passing judgment on his tenure application, DePaul deviated from its own procedures: the Faculty Handbook calls for the provost, Epp, to make a "recommendation" to the president, yet DePaul maintains that the provost did not participate in the tenure deliberations or cast a vote, and that he instead passively transmitted the UBPT's report to the president. Doc. 72 at 7; Doc. 74 at ¶ 43-45. It is true that "an employer's failure to follow its own internal employment procedures *can* constitute evidence of pretext." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005) (emphasis added). But no such inference is appropriate here. The relevant passage of the Handbook states: "The third stage of the review is by the [UBPT], which meets during the spring quarter. The executive vice president for academic affairs [the provost] makes a recommendation to the president based on the [UBPT's] decision." Doc. 75-2 at 36. Assuming this passage should be interpreted to require substantive input by the provost, rather than merely his ministerial transmission of the UBPT's recommendation, there is no reason to believe that Epp's apparent failure to participate substantively in the tenure decision was anything other than harmless and inconsequential. The UBPT had already made its determination that Montgomery did not merit tenure, and the record gives no reason to believe that a recommendation from Epp "based on" the UBPT's decision might have favored tenure. Montgomery has pointed to no evidence (beyond the Handbook's statement of procedure) that Epp usually participates substantively in tenure decisions; perhaps the provost's failure to participate in this case was not irregular at all. Even if it was irregular, it is not a *suspicious* irregularity of the sort that could raise a plausible inference that something was amiss; it does not suggest that DePaul was cutting corners to reject Montgomery or that it

-10-

was denying him a procedural protection that is usually available and that might have made a difference in his case. Indeed, Epp's nonparticipation in the decision-making process weakens Montgomery's claim of discrimination, because Epp is the only DePaul official whom Montgomery alleges was racially insensitive or insufficiently supportive of diversity, Doc. 35 at ¶¶ 18(c), 26; Doc. 74 at ¶ 49, other than Montgomery's friend Steele, Doc. 74 at ¶ 51, whom Montgomery does not argue had any responsibility for the tenure decision.

Even if Epp did play a substantive role in the tenure decision, none of Montgomery's evidence about Epp could support his discrimination claim. That evidence shows that Epp grew uncomfortable when challenged by Montgomery about DePaul's diversity initiatives; yet Epp also expressed support for those initiatives and agreed that more needed to be done. Doc. 78-5 at 22-23. That evidence also shows that during a lecture Epp screened part of a film on the history of cinema that included a clip of a historically significant 1915 movie (D. W. Griffith's *Birth of a Nation*) that contains racially offensive imagery. Doc. 74 at ¶¶ 49-50, 56; Doc. 81 at ¶ 43. Those facts could not support an inference that Epp was hostile to African-Americans or that he had it in for Montgomery because of his race, which may be why Montgomery makes no effort to prove his case under the direct method of proof. Moreover, it was Epp who made the decision to hire Montgomery in the first place. Doc. 74 at ¶ 4. Particularly given the absence of any evidence that Epp was biased against Montgomery on account of race, the fact that Epp hired him "undermines any inference" that Epp discriminated against him on racial grounds when he applied for tenure. *Blasdel*, 687 F.3d at 820.

Third, Montgomery argues that the large statistical disparity between African-Americans and others among the School's tenured faculty members raises an inference that DePaul's explanation for not granting him tenure is pretextual. It is true that none of the School's

-11-

approximately 85 tenured faculty members is African-American, Doc. 81 at ¶ 14, although one is

from Nigeria, *ibid*.; Doc. 78-7 at 29-30.  Yet the case on which Montgomery relies, *Davis v.

Weidner*, 596 F.2d 726 (7th Cir. 1979), states that "such general (statistical) determinations,

while helpful, may not be in and of themselves controlling as to an individualized hiring

decision, particularly in the presence of an otherwise justifiable reason" for that decision.  *Id*. at

732 (quoting *McDonnell Douglas*, 411 U.S. at 805 n.19).  More recently, the Seventh Circuit

reaffirmed that "statistical evidence can be very useful to prove discrimination in [disparate

treatment cases], but it will likely not be sufficient in itself."  *Adams v. Ameritech Services, Inc.*,

231 F.3d 414, 423 (7th Cir. 2000); *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1252 (7th Cir.

1990).  And more recently than that, the Seventh Circuit declined to endorse the notion that "a

questionable pattern of promotion, standing alone, is sufficient evidence to withstand summary

judgment."  *Sun*, 473 F.3d at 813.  Because Montgomery's other attempts to rebut DePaul's

nondiscriminatory explanation are unpersuasive, his statistics cannot save him from summary

judgment.

Fourth, Montgomery argues that DePaul has provided shifting and inconsistent

explanations for denying him tenure.  "One can reasonably infer pretext from an employer's

shifting or inconsistent explanations for the challenged employment decision."  *Appelbaum v.

Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003).  Montgomery argues that

"DePaul has created new reasons for denying Montgomery tenure after he initiated litigation

including: (i) President Holtschneider's reliance on yearly probationary evaluations which were

not part of Montgomery's tenure application; (ii) President Holtschneider's deposition testimony

that Montgomery's record did not meet [the School's] Personnel guidelines of definition [*sic*]

'high quality'; (iii) Dean Miller's deposition testimony that Montgomery's teaching record was

'mixed and hard to judge'; and (iv) Dean Miller's deposition testimony that he was concerned about whether Montgomery's service to the University would continue after he was granted tenure." Doc. 72 at 8-9 (footnotes omitted). But these rationales are entirely consistent with the rationale stated by the UBPT and adopted by the president: that Montgomery's research was weak, that his teaching was good but not excellent, and that his service was strong but could not make up for his other shortcomings. They do not show that DePaul's stated reason for denying Montgomery tenure has shifted over time in a way that might suggest that those reasons are lies meant to cover up a true, discriminatory reason.

In short, DePaul has met its burden at step two of the indirect method to produce evidence that it denied Montgomery tenure for legitimate, nondiscriminatory reasons, and Montgomery has failed to meet his burden to adduce evidence plausibly suggesting that DePaul's reasons are pretextual. Accordingly, DePaul is entitled to summary judgment on Montgomery's race discrimination claim.

## II.    Retaliation – Denial of Tenure

Montgomery also claims that DePaul denied him tenure in retaliation for engaging in statutorily protected activities, in violation of Title VII and § 1981. The purpose of Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), is to advance the statute's ban on employment discrimination "by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006); *see also id*. at 68 (the "antiretaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms … by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers") (citation

omitted) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)).  A court "appl[ies] the same elements to retaliation claims under Title VII and § 1981," *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009), so only Title VII will be referenced in discussing Montgomery's retaliation claims.

"A plaintiff may establish unlawful retaliation using either the direct or indirect method of proof." *Ibid*.  Montgomery proceeds only under the direct method.  Doc. 72 at 9-10.  Under the direct method, a plaintiff "must demonstrate that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal connection exists between the two." *Stephens*, 569 F.3d at 786.  Because Montgomery suffered a materially adverse action when he was denied tenure, *see Sun*, 473 F.3d at 814, his claim turns on the first and third elements.

With respect to the first element, Montgomery asserts that he engaged in protected activity by assisting several colleagues who had been fired by DePaul for allegedly discriminatory or retaliatory reasons.  Doc. 35 at ¶ 18; Doc. 74 at ¶¶ 54-55, 67-68.  DePaul contends that Montgomery cannot establish retaliation based on this assistance because he admits that he did not participate in any investigation or proceeding on his terminated colleagues' behalf and because no DePaul official was aware that Montgomery thought they had been subjected to treatment that violated the civil rights laws.  Doc. 60 at 8-9.  If no DePaul official knew Montgomery had engaged in protected activity, that activity could not have had a causal connection to the tenure denial.  *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) ("In order to establish retaliation pursuant to Title VII, the employer must have had actual knowledge of the protected activity in order for its decisions to be retaliatory."); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668 (7th Cir. 2006) ("It is not sufficient that

-14-

[an employer] could or even should have known about [an employee's] complaint; the employer must have had actual knowledge of the complaints for [its] decisions to be retaliatory.") (alterations in original) (internal quotation marks omitted); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("absent [actual employer] knowledge, there can be no causal link").

Montgomery's brief makes no response to DePaul's argument; his short section on retaliation does not even mention the assistance he rendered to his terminated colleagues. Doc. 72 at 9-10. He also makes no mention of those events in his Local Rule 56.1(b)(3)(C) statement of additional material facts. Doc 73. And in his Local Rule 56.1(b)(3)(B) response to DePaul's Local Rule 56.1(a)(3) statement, Montgomery admits that he never informed any DePaul official that he thought any of his colleagues had been subjected to discriminatory or retaliatory treatment and that he did not participate in any investigation or proceeding arising out of that treatment. Doc. 74 at ¶¶ 54-55, 67. Accordingly, even assuming Montgomery's activities on behalf of his colleagues were protected, in the absence of any evidence that any DePaul official was aware of those activities, a jury could not find that those activities were causally connected DePaul's decision not to grant him tenure.

Montgomery also asserts that he engaged in protected activity by advocating for greater racial diversity at DePaul through his participation on the School's Diversity Committee and conversations with various DePaul officials. Doc. 35 at ¶ 18; Doc. 74 at ¶¶ 56-58, 64, 66. DePaul correctly responds that this advocacy is not protected activity. Title VII's anti-retaliation provision prohibits an employer from taking action against an employee "[1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Montgomery's

advocacy of diversity plainly does not fall within the second part of this provision, the

"participation clause," for at the time he was denied tenure, he had not "made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title

VII. The question thus becomes whether Montgomery's advocacy falls within the first part, the

"opposition clause": Does advocacy of racial diversity, standing alone, constitute opposition of

"any practice made an unlawful employment practice by" Title VII? The answer is "yes" only if

an employer's *failure* to engage in affirmative action or otherwise increase racial diversity in its

workforce, taken alone, violates Title VII. If the answer is "no," then Montgomery was not

opposing anything made unlawful by Title VII, which means that his advocacy was not protected

activity and therefore cannot ground a retaliation claim.

 The answer is "no." Title VII explicitly provides that it does not require affirmative

action to remedy the under-representation of a minority group:

> Preferential treatment not to be granted on account of existing number or
> percentage imbalance
>
> Nothing contained in this title shall be interpreted to require any employer
> … to grant preferential treatment to any individual or to any group because
> of the race … of such individual or group on account of an imbalance which
> may exist with respect to the total number or percentage of persons of any
> race employed by any employer … in comparison with the total number or
> percentage of persons of such race … in any community, State, section, or
> other area, or in the available work force in any community, State, section,
> or other area.

42 U.S.C. § 2000e-2(j). In holding that Title VII does not *prohibit* preferential treatment by an

employer that is intended to increase representation of an under-represented minority, the

Supreme Court noted that this provision was intended to answer the objections of opponents of

Title VII who "argued that the Act would be interpreted to *require* employers with racially

imbalanced work forces to grant preferential treatment to racial minorities in order to integrate."

-16-

*United Steelworkers of Am. v. Weber*, 443 U.S. 193, 205-06 (1979). As the Court explained two years later: "Title VII … does not demand that an employer give preferential treatment to minorities or women. … It does not require the employer to restructure his employment practices to maximize the number of minorities and women hired." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981); *see also Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 594 (2d Cir. 1988) ("The essence of appellant's complaints … was that Columbia was not pursuing affirmative action goals in this selection process. Since section [2000e-2(j)] states that affirmative action in employment practices is not required by Title VII, an employer's failure to follow its own voluntary affirmative action program cannot, by itself, constitute an unlawful employment practice" under Title VII.). Because Title VII does not make it an unlawful employment practice for an employer to fail to address racial imbalances with affirmative action, an employee who advocates diversity initiatives does not "oppose[] any practice made an unlawful employment practice by" Title VII. *See Holden v. Owens-Illinois, Inc.*, 793 F.2d 745, 749 (6th Cir. 1986) ("Since Title VII does not require the adoption of affirmative action programs, to the extent that plaintiff sought to implement an affirmative action plan … , plaintiff was not opposing a practice that violated Title VII," and so the plaintiff's advocacy was not "protected conduct under the 'opposition clause.'"); *Moffett v. Chi. Transit Auth.*, 1994 WL 127711, at *5 (N.D. Ill. April 5, 1994) (same).

Montgomery responds that Title VII's opposition clause protects not only opposition of an actual Title VII violation, but also opposition of employer actions that the plaintiff reasonably believes violate Title VII. *See Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008); *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 706-07 (7th Cir. 2000); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1457-58 (7th Cir. 1994). For example, an

-17-

employee fired for opposing discrimination that is not so severe that it "affects the terms and conditions of employment" within the meaning of Title VII may still have a good retaliation claim if a reasonable person could have thought the discrimination *was* severe enough to violate Title VII. *See Hamner*, 224 F.3d at 707. However, "[t]he plaintiff must not only have a subjective (sincere, good faith) belief that he opposed an unlawful practice; his belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII." *Ibid*. In *Hamner*, the plaintiff was fired after complaining that his employer subjected him to harassment based on his sexual orientation, and the Seventh Circuit held that he could not establish his retaliation claim because Title VII does not prohibit discrimination or harassment based on sexual orientation. *Ibid*. Likewise, Montgomery cannot prevail on his retaliation claim because, as shown above, Title VII does not make unlawful an employer's failure to pursue an affirmative action policy. As in *Hamner*, Montgomery's mistake is about the sort of activity banned by Title VII, not about whether particular facts rise to a violation; it follows that his mistake is not objectively reasonable. *See Magyar*, 544 F.3d at 771 ("The objective reasonableness of the belief is not assessed by examining whether the conduct was persistent or severe enough to be unlawful, but merely whether it falls into the category of conduct prohibited by the statute.").

For these reasons, Montgomery cannot satisfy the first element of his retaliation claim under the direct method, and because he does not attempt to forestall summary judgment under the indirect method, the claim fails. The court will add for good measure that, with respect to the third element of Montgomery's direct case, a reasonable jury could not conclude that DePaul denied him tenure because of his advocacy of affirmative action. Epp's reaction when challenged about the School's pursuit of racial diversity during a faculty meeting, shows only

that he felt that Montgomery's language about holding administrators "accountable" for the

School's diversity shortcomings was too strong and that he may have become uncomfortable

when Montgomery pursued the issue. Montgomery admits that his role on the Diversity

Committee was aided and encouraged by DePaul, which enabled him to establish the committee,

and that his participation on the committee (which he highlighted to the UBPT when he came up

for tenure) was part of his service, which the UBPT rated as "strong," the most impressive aspect

of his work at DePaul. Doc. 74 at ¶¶ 58, 64-65. Montgomery also admits that DePaul itself

initiated several university-wide diversity initiatives and was ranked nineteenth in the nation in

Diversity MBA Magazine's April 2009 list, "50 Out Front for Diversity Leadership: Best Places

for Diverse Managers to Work." *Id*. at ¶¶ 61-62.

The only argument Montgomery makes in seeking to establish a causal connection

between his advocacy of racial diversity and DePaul's tenure decision is that "Dr. Epp, sitting as

*ex officio* to the UBPT and responsible for providing a recommendation for or against tenure to

the President, was aware of Montgomery's activities." Doc. 72 at 10. The fact that Epp knew

that Montgomery (like DePaul itself) favored greater racial diversity among the faculty does not

even remotely suggest that Epp held it against Montgomery, any more than the fact that an

employer rejects a job applicant whom he knows to be of a certain race suggests that the

employer acted because of the applicant's race. There is simply no evidence that anyone at

DePaul was opposed to Montgomery's advocacy for greater racial diversity, and without such

evidence, no jury could find that his advocacy was causally connected to the denial of tenure.

## III.    Retaliation – Refusal to Rehire as an Adjunct

Montgomery claims that DePaul retaliated against him in violation of Title VII and

§ 1981 when it refused to rehire him to the adjunct teaching position he held in winter 2010 after

-19-

being denied tenure; he alleges that DePaul's refusal to rehire him was retaliation against him for bringing this lawsuit, which as initially framed challenged only the tenure denial.  Montgomery again seeks to proceed under the direct method, which requires that he "demonstrate that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal connection exists between the two." *Stephens*, 569 F.3d at 786. Unlike his tenure denial claims, this claim may proceed to trial.

Regarding the first element of his direct case, there is no doubt that Montgomery's filing of a complaint alleging race discrimination by DePaul was a statutorily protected activity. *See Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 664 (7th Cir. 2011) ("Filing charges with the EEOC and pursuing a lawsuit in an attempt to vindicate those charges are the most obvious forms of statutorily protected activity.").

As to the second element, DePaul argues that its failure to rehire Montgomery was not a "materially adverse action" because Montgomery "had no right to or expectation of further teaching opportunities," having been told at the outset that the winter 2010 course was likely to be a one-time arrangement "and carried with it no expectation or right to renewal."  Doc. 60 at 11.  This argument is couched not in Title VII's "materially adverse action" language, but in federal due process standards asking whether an individual has a constitutionally protected property interest in government employment. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Redd v. Nolan*, 663 F.3d 287, 290 (7th Cir. 2011).  The two doctrines are entirely separate; for instance, while an at-will employee generally has no property interest in continued employment for due process purposes, *see Roth*, 408 U.S. at 578; *Montgomery v. Stefaniak*, 410 F.3d 933, 939 (7th Cir. 2005), an at-will employee fired on the basis of his race of course has a good employment discrimination claim under Title VII, *see Walker v. Abbott Labs.*, 340 F.3d

471, 474 (7th Cir. 2003) (Title VII "does not require a contractual relationship"). DePaul also

cites Illinois cases that, DePaul says, show that "Illinois courts have refused to extend common

law retaliatory discharge claims to encompass failure to renew a contract." Doc. 60 at 12 n.4.

Again, that state common law doctrine is distinct from and irrelevant to the federal statutory

regime created by Title VII. DePaul cites no Title VII decisions supporting its argument that

failure to rehire an employee to a position that he did not reasonably expect to get is not a

materially adverse action.

In fact, an employer's refusal to hire or rehire an applicant is a classic adverse action that,

when done on a prohibited basis, violates Title VII. *See* 42 U.S.C. § 2000e-2(a)(1). In the

context of retaliation, the question is whether the challenged action "well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68

(internal quotation marks omitted). An employer's refusal to rehire an employee to limited-term

employment such as an adjunct teaching position plainly meets that standard. Because DePaul's

refusal to rehire Montgomery was an adverse employment action, the second element of

Montgomery's retaliation claim is established.

With respect to the third element, DePaul argues that Montgomery's filing of this lawsuit

is not what caused DePaul to decline to rehire him after the winter 2010 term. Specifically, it

maintains that it told Montgomery from the start that the winter 2010 employment was unlikely

to continue beyond that term, that it did not fire him upon learning of his lawsuit but merely

allowed his term of employment to end naturally, and that at that point it had no further need for

Montgomery's services because there was no further demand for the course he had taught. Doc.

60 at 12; Doc. 80 at 14-15. But Montgomery has adduced evidence from which a reasonable

jury could conclude that his protected activity *was* the cause of his not being rehired: the

-21-

contemporaneous email and later deposition testimony of Stevens, who had hired him to teach

the winter 2010 course.  In an email to Epp sent days after this suit was filed, Stevens wrote, "I

just heard about Jami's suit—this is news (and not good news) to me. … Sorry about this.  We

will of course not hire him back in Spring."  Doc. 78-1 at 1.  And at his deposition, Stevens said:

> After I heard that the lawsuit had been filed, I didn't want to have a faculty
> member in there who felt so strongly about—so strongly negatively about
> the university.  I didn't think it was appropriate to have a faculty member in
> the classroom who was—felt wronged by the university.  I also felt it put
> the faculty in a—it was choosing sides on my part, which I was not willing
> to do.  We are a very collegial school and it would be very difficult to have
> someone who's suing, who was that unhappy to be in the school.

Doc. 78-9 at 24.

A reasonable jury could understand this to mean that Montgomery's filing of this lawsuit

caused Stevens to decide not to rehire him.  Perhaps Stevens did not realize that refusing to

rehire Montgomery because he had filed the complaint was unlawful, and perhaps he came to his

decision based on beneficent rather than malicious motives, but that is irrelevant so long as

Stevens, acting for DePaul, decided that because Montgomery had sued the university for race

discrimination, he should not be rehired to teach there.  And perhaps a jury could believe

DePaul's submission that Stevens's retaliatory motive did not cause it to rehire Montgomery

because Stevens would not have rehired Montgomery even in the absence of this lawsuit, since

there was either insufficient demand for the course he had taught (and similar courses he might

have been eligible to teach) or other faculty who could have taught the course instead.  But

because the evidence would not compel a reasonable jury to find in DePaul's favor, DePaul is

not entitled to summary judgment on this claim.

IV.     **Breach of Contract**

Finally, Montgomery claims that DePaul breached its obligations to him under the

Faculty Handbook by failing to follow the precise tenure procedures set out in the Handbook,

and that this failure contributed to DePaul's decision not to grant him tenure.  Because the

parties agree that Illinois law governs this claim, the court will apply that law.  *See McFarland v.*

*Gen. Am. Life Ins. Co.*, 149 F.3d 583, 586 (7th Cir. 1998).  "Under Illinois law, the interpretation

of a contract presents a question of law that is decided by the court."  *Rickher v. Home Depot,*

*Inc.*, 535 F.3d 661, 664 (7th Cir. 2008).  The Illinois Supreme Court has held "that an employee

handbook or other policy statement creates enforceable contractual rights if the traditional

requirements for contract formation are present."  *Duldulao v. St. Mary of Nazareth Hosp. Ctr.*,

505 N.E.2d 314, 318 (Ill. 1987); *see also Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007).

DePaul does not argue that the Handbook was not a binding contract between it and

Montgomery, so the court assumes that it was a contract.

Montgomery contends that DePaul breached the following provision of the Handbook's

section on "Promotion and Tenure Review":

> Decisions subsequent to that made at the initial level shall consider the
> method and care of application of the approved standards by the lower level
> unit(s), including matters of stringency, consistency, and fairness, in
> addition to any unusual implications the decision may have at the
> college/school or university level.  Only in cases where lower level
> decisions are judged to be deficient in significant respects shall upper level
> units make their own application of the substantive criteria of the
> candidate's scholarly or artistic area.

Doc. 75-2 at 26.  In particular, Montgomery argues that the UBPT violated the provision's

second sentence by voting to deny him tenure despite the 26-to-7 vote favoring tenure by his

department and Dean Miller's pro-tenure recommendation, without making an explicit finding

that the department's and Miller's assessments had been "deficient in significant respects."  At

least this seems to be his argument; the relevant portion of his brief reads:

> With respect to the authority of the UBPT, the Faculty Handbook explicitly
> circumscribes the ability of the UBPT to apply their own application of the
> substantive criteria.  In this case, the provision requiring each successive
> review level to determine that a significant deficiency occurred in a lower
> level's review such that a successive level could conduct an independent
> evaluation of Montgomery's qualifications was not fulfilled as evidenced
> by UBPT's recommendation and the President's letter to Montgomery.

Doc. 72 at 12-13.

The UBPT's recommendation and the president's final decision do not evidence any

breach of the Handbook provision.  The provision cannot reasonably be read to require that the

UBPT announce an *explicit* finding that the lower levels' applications of the tenure criteria were

"deficient in significant respects" before coming to a contrary decision; if the UBPT rejects a

lower level's decision, that alone makes clear that the UBPT thought the lower level's decision

was significantly deficient.  Moreover, the provision must be read in light of other provisions,

such as the Handbook's mandate that the UBPT has the responsibility "to apply current

university-wide standards and criteria for tenure and promotion" and its statement that the

president should overrule the UBPT only in rare instances.  Doc. 75-2 at 37.  These provisions

convey that the UBPT (unlike the president) has substantial discretion to decide for itself

whether applicants merit tenure rather than merely rubber-stamping the decisions of the

applicant's department and dean.

In Montgomery's case, the UBPT noted that although his department favored tenure, he

had received a high number of "no" votes (seven) from his colleagues; that even among the 26

computer science faculty who voted for tenure, only nine thought his scholarship was strong;

that his teaching was "good" and his service "strong"; and that "a strong service record is not

sufficient when teaching and research appear to be weak or, at the best, minimally meeting requirements." Doc. 75-5 at 5. In other words, the UBPT leaned on the views of Montgomery's departmental colleagues regarding his strengths and weaknesses rather than rejecting them outright. The problem was that Montgomery's colleagues—even most of those who voted for him—did not think he was a strong scholar, and that the UBPT considered that factor to be decisive. As noted above, it is extremely difficult to show in a lawsuit that such a judgment violates a rejected tenure applicant's rights. *See Blasdel*, 687 F.3d at 815 (citing cases).

It bears mention that most of the candidates as to whom the UBPT recommended against tenure that year had majorities of their respective departments vote them up for tenure, while most of those whom the UBPT recommended for tenure that year received unanimous votes in their favor from their departments. *Id*. at 3-12. Given this backdrop, the UBPT reasonably viewed Montgomery's 26-to-7 departmental vote as a weak recommendation. And the president's letter denying him tenure simply tracks the UBPT's recommendation; it no more evidences a breach of the Handbook's procedure than does that recommendation.

DePaul therefore is entitled to summary judgment on Montgomery's contract claim. Because summary judgment rests on this ground, there is no need to address DePaul's alternative argument that Montgomery himself was in material breach, and therefore not entitled to performance by DePaul as a matter of law, because he had secretly held full-time outside employment with Lucent Technologies throughout his employment at DePaul.

## Conclusion

For the foregoing reasons, DePaul's motion for summary judgment is granted as to all of Montgomery's claims, except for his claim that DePaul retaliated against him in violation of

Title VII and § 1981 when, after he filed this lawsuit, it refused to hire him for further adjunct employment. That claim will proceed to trial.

September 7, 2012

_____
United States District Judge